



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 3, 2024

**BY ECF**

The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:   *United States v. Leo Hernandez*, **24 Cr. 170 (AT)**

Dear Judge Torres:

    The Government respectfully submits this letter in connection with the sentencing of defendant Leo Hernandez, scheduled for November 12, 2024, and in response to the defendant's letter dated October 2, 2024 ("Def. Ltr.") (Dkt. 26). For the reasons that follow, the Government recommends that the Court impose a sentence of at least 366 days' imprisonment and a fine of at least $7,500.

    **I.**    **The Defendant's Offense Conduct**

    **A. Overview**

    The defendant obstructed the sentencing proceeding in a federal narcotics prosecution brought in this District, that is, *United States v. Leo Hernandez*, No. 20 Cr. 79 (RMB) (the "Narcotics Case"), by, among other things, (a) falsely stating to the Probation Office that he had an opioid addiction, which was then incorporated into the defendant's presentencing investigation report in that case (the "Narcotics Case PSR"),[1] and (b) causing his attorney in the Narcotics Case to make false representations to the Court in connection with sentencing regarding the defendant's purported addiction, including a claim that the defendant's addiction motivated his criminal conduct for which he was prosecuted in that case. (Dkt. 1 ¶ 3). However, in truth and in fact, the defendant had no such addiction, and provided false information to the Court in an improper attempt to obtain leniency at sentencing. (Dkt. 1 ¶ 3).

---

[1] The Narcotics Case PSR, dated October 5, 2022, was filed under seal at docket number 100 in the Narcotics Case.

Honorable Analisa Torres
United States District Judge
November 3, 2024
Page 2

### B. The Defendant's Lies to the Probation Office and the Court

On or about January 28, 2020, a grand jury sitting in this District charged the defendant with one count of conspiracy to distribute narcotics, in violation of 21 U.S.C. § 846 (the "Narcotics Indictment"). (Dkt. 1 ¶ 4.a). On April 27, 2021, the Indictment was unsealed. (Dkt. 1 ¶ 4.b). On April 28, 2021, the defendant was arrested on the charge in the Indictment upon his arrival in the United States after previously being apprehended in Colombia. (Dkt. 1 ¶ 4.c).

On April 28, 2022, the defendant pled guilty to the sole count of the Narcotics Indictment pursuant to a plea agreement. (PSR ¶ 7).[2] Upon acceptance of the defendant's plea, the Court directed that a presentence investigation report be prepared by the Probation Office and advised the defendant as follows:

> THE COURT: Mr. Hernandez, in my view, it's in your best interest to cooperate with the probation department to prepare the presentence report because that report will be important in my decision as to what your sentence will be. So I suggest that you tell them what they ask, consulting, of course, with [HERNANDEZ's defense counsel], both the good things and the not so good things. Because if you don't disclose something that they ask you about and they—meaning the probation department—find it out themselves, then they might say that you were not being truthful with them and that would not be helpful to you.
>
> THE DEFENDANT: Yes, your Honor. I understand.
>
> THE COURT: You and [HERNANDEZ's defense counsel] and the government will have the right and the opportunity to examine this presentence report before the sentencing date, to file any objections that you find objectionable in the presentence report. So I urge you to review it carefully with [HERNANDEZ's defense counsel] and discuss it with him carefully before sentencing. If there are any mistakes in the presentence report, please point them

---

[2] "PSR" refers to the presentence investigation report, dated September 10, 2024, filed under seal by the Probation Office at docket 25 in this case.

> out to [HERNANDEZ's defense counsel] so that he can point them out to me before the sentencing so that I don't proceed on the basis of mistaken information.

(PSR ¶ 8; Dkt. 1 ¶ 4.d).

The defendant was subsequently interviewed, in the presence of his counsel, by the Probation Office, in the course of preparing the Narcotics Case PSR. (PSR ¶ 9; Dkt. 1 ¶ 5.a). During the interview, the defendant's counsel reminded the defendant to be honest in answering the Probation Officer's questions. (Dkt. 1 ¶ 5.a). The Probation Officer then inquired with the defendant regarding his history of substance abuse. (Dkt. 1 ¶ 5.b). The defendant made statements to the Probation Officer regarding his purported history of substance abuse, including statements that were the sole basis for the Probation Officer including the following in the Narcotics Case PSR:

> Between 2014 and 2018, the defendant used Oxycodone daily. He reported that he was prescribed Oxycodone while recovering from surgery on his ankle and later became addicted.

(PSR ¶ 9; Dkt. 1 ¶ 5.b).

Based exclusively on the defendant's statements regarding his purported addiction to Oxycodone, the Probation Officer stated in the Narcotics Case PSR that, because "the defendant has a history of drug usage, we believe a special condition requiring drug treatment is warranted." (PSR ¶ 10; Dkt. 1 ¶ 5.c). In particular, the Narcotics Case PSR recommended that the Court impose the following special condition of supervised release:

> You will participate in an outpatient treatment program approved by the United States Probation Office, which program may include testing to determine whether you have reverted to using drugs or alcohol.

(PSR ¶ 10; Dkt. 1 ¶ 5.c).

On October 3, 2022, the defendant's counsel submitted a sentencing memorandum to the Court in the Narcotics Case that included repeated references to the defendant's purported drug abuse problem, including the following:

> Already prescribed oxycodone . . . prior to the injury, Leo's dependence on the drug and his concomitant involvement in the conspiracy only deepened from that point. Leo recalls that his ankle injury truly hastened the worst period of his addiction that led him

> to obtain more and more pills which he took both to feed his habit and also sold to others.
>
> In and around 2017, with both his addiction and his offending behavior continuing, Leo (in moments of clarity and honest reflection) reports he became increasingly aware that he was not moving in the right direction. He was unsuccessful in his attempt to simply stop using "cold turkey" or completely divest himself of his activities in the conspiracy as the two were of course, inextricably intertwined. Nevertheless, Leo slowly began tapering down his weekly and then daily usage over a sustained period as he knew this would be the only way for him to fight his way out of the significant addiction problems that he had brought upon himself. While he tapered down his drug use over time, Leo also began formulating a plan for a new direction in his life, which included both a change in career and a complete change in scenery. He had always been enamored with Colombia and had long dreamed of moving down there and opening his own tourism business. Feeling like he was in an inescapable rut- no doubt due to his thoroughgoing guilt and uneasiness with his criminal offending and his addiction problems, Leo fully invested himself in turning what had always been a bit of fanciful dream into a reality. By the end of the calendar year 2017, Leo had made the necessary preparations, cut down his opioid use to zero, and moved for the first time in his life, out of New York City, resettling in Cartagena, Colombia.

(PSR ¶ 11; Dkt. 1 ¶ 6.a). The defendant's counsel's sentencing memorandum also included the following statement: "The days of giving in to temptation and the addiction-fueled thinking that drove his continued offending for the sustained period of time in the indictment are gone forever." (Dkt. 1 ¶ 6.b). The defendant's counsel urged the Court to impose a sentence of "time-served" in consideration of, among other things, the defendant's purported "addiction during his period of offending." (PSR ¶ 11; Dkt. 1 ¶ 6.c; Narcotics Case Dkt. 99 at 21-22).

On October 18, 2022, the defendant appeared before the Court for sentencing in the Narcotics Case. (PSR ¶ 12). During that hearing, the Court explained, in describing its understanding of the defendant's history and characteristics, that the Narcotics Case PSR contained the following:

  i. "The purpose for [the defendant's narcotics trafficking conduct] was so that he could use those prescriptions personally, 'he,' Mr. Hernandez, and also so that he could resell some of them. Mr. Hernandez . . . became addicted to oxycodone after he was prescribed oxycodone for an ankle injury."

           ii. The defendant "reported to probation that he had . . . used oxycodone and that . . . he had become addicted to oxycodone."

(PSR ¶ 12; Dkt. 1 ¶ 6.d).

At that sentencing hearing, the Court confirmed with the defendant that he had read and discussed the Narcotics Case PSR with his counsel and that he had no objections to raise. The Court noted that, although "[d]efense counsel acknowledges that the offense is serious and warrants serious consequences," "[h]e also asks the Court, however, to consider, among other things, Mr. Hernandez's . . . addiction." (Narcotics Case Dkt. 108 at 7). The defendant's sentencing range pursuant to the United States Sentencing Guidelines was 30 to 37 months' imprisonment. (PSR ¶ 13). The defendant sought a sentence of "time-served." (Narcotics Case Dkt. 99 at 22). The Government requested that the Court impose a sentence within the Guidelines range. (Narcotics Case Dkt. 101 at 1). The Court sentenced the defendant to a below-Guidelines sentence of 20 months' imprisonment, which was approximately equivalent to the amount of time he had served in pretrial detention, to be followed by three years' supervised release. (PSR ¶ 13; Dkt. 1 ¶ 6.f).

### C. The Defendant's Consciousness of Guilt

The defendant completed serving his sentence of imprisonment imposed in the Narcotics Case on October 20, 2022, and commenced serving his term of supervised release on that date. (Dkt. 1 ¶ 7). Consistent with the Narcotics Case PSR's recommendation, one of the conditions of the defendant's supervised release was that he participate in a drug treatment program. (Dkt. 1 ¶ 8.a). During the intake assessment for that program, the defendant stated that he had never had a drug problem.[3] (PSR ¶ 14; Dkt. 1 ¶ 8.b). Similarly, the defendant repeatedly stated to a counselor that he had never had a drug problem and did not want to take part in drug counseling because it was unnecessary. (PSR ¶ 14; Dkt. 1 ¶ 8.c).

On August 23, 2023, the Court held a supervised release conference for the defendant. (PSR ¶ 15; Dkt. 1 ¶ 9). During that conference, the Court inquired with the defendant about why he was "resistant[]" to participating in the drug treatment program as required by the conditions of his supervised release. (Dkt. 1 ¶ 9.a). The defendant responded as follows:

> . . . I did lie on the presentence report. I didn't have—I never had an addiction on opiates. I actually never even took the pills when I did get them for my surgery. I sold them instead. And that is the truth and it's very hard for me to relate to other people in the program that are addicted. I am doing anything everything that I need to do. It's a little tough for me to just relate to everybody. And I know it's my own fault.

---

[3] On one later occasion, the defendant falsely told a counselor that he lied at the intake assessment. (Dkt. 1 ¶ 8.b n.1).

> I lied on the presentence report. So there is really nothing I can say about it. It's my fault.

(PSR ¶ 15; Dkt. 1 ¶ 9.a). The Court then asked the defendant, "What was the purpose of lying, though, on the report? What was the benefit of doing that?" (PSR ¶ 16; Dkt. 1 ¶ 9.b). The defendant replied, "I was in prison at the time, and I thought maybe I might get a more lenient sentence, you know." (PSR ¶ 16; Dkt. 1 ¶ 9.b).

After the August 2023 supervised release conference, the defendant admitted the following, in substance and in part, to the Probation Officer who was supervising him at that time:

    a. The defendant lied about his drug abuse history in his interview with the Probation Office in preparation for the Narcotics Case PSR. (Dkt. 1 ¶ 10.a).

    b. The defendant has never had a drug problem. (Dkt. 1 ¶ 10.b).

    c. The defendant did not take any of the pills he trafficked as part of the scheme for which he as prosecuted in the Narcotics Case. (Dkt. 1 ¶ 10.c). Rather, the defendant sold all of the pills to make money. (Dkt. 1 ¶ 10.c).

    d. The defendant occasionally used drugs at parties, but never abused them or had any addictions. (Dkt. 1 ¶ 10.d).

At a subsequent supervised release conference held on November 28, 2023, in the context of discussing the information that appeared in the Narcotics Case PSR pertaining to the defendant's purported drug addiction, the Court stated, in part, "the presentence investigation report is probably the most important document in the case. Actually, in this case that is on file. So, if it's made up, I don't know. I don't know what to say about it. If it's made up, it actually presents another issue." (Dkt. 1 ¶ 9.b n.2).

## II. The Defendant's Criminal History

In the Narcotics Case, the defendant pled guilty to participating in an opioid diversion scheme. At the center of that scheme was Dr. Joseph Olivieri. Olivieri practiced medicine in Manhattan and participated in a years-long scheme to divert oxycodone and other controlled substances for illicit use. (Narcotics Case PSR ¶ 15). Olivieri was one of the top fifteen prescribers of opioids in New York State during much of the scheme. (Narcotics Case PSR ¶ 15). He prescribed more than 250,000 pills of controlled substances, including highly addictive opioids such as oxycodone, oxymorphone, and morphine sulfate to individuals he knew did not have a legitimate medical need for them. (Narcotics Case PSR ¶ 15). Olivieri was paid cash for those prescriptions, often by other individuals, who arranged with Olivieri for individuals posing as "patients" to obtain the prescriptions from Olivieri. (Narcotics Case PSR ¶ 15). Coconspirators then collected the prescription pills for their unlawful resale. (Narcotics Case PSR ¶ 15). During

Honorable Analisa Torres
United States District Judge
November 3, 2024
Page 7

the course of the scheme, Olivieri deposited into his bank accounts more than one million dollars in cash. (Narcotics Case PSR ¶ 15).

Many of the individuals who received medically unnecessary prescriptions from Olivieri were directed to do so by "crew chiefs." (Narcotics Case PSR ¶ 16). The crew chiefs would collect from the putative "patients" at least some of the prescribed substances, including for their unlawful resale. (Narcotics Case PSR ¶ 16). The crew chiefs included, among others, Matthew Brady, Kristopher Taglianetti, Anastasios Verteouris, and the defendant. (*See* Narcotics Case PSR ¶ 16).

From 2014 into 2018, the defendant directed others to obtain medically unnecessary prescriptions from Olivieri so that he could resell those medications. (Narcotics Case PSR ¶ 17).

The defendant introduced Taglianetti to Olivieri. As a result, Taglianetti paid the defendant as "tribute" approximately two dollars per pill that Taglianetti arranged to be sold. On multiple occasions, Taglianetti collected pills from his putative "patients" and sold those pills to the defendant at the defendant's residence.

During much of the time period of the offense, the defendant frequently traveled between the United States and Colombia. For example, travel records reflect that in 2017 alone, the defendant flew between the United States and Colombia approximately twenty times. In 2018, when Olivieri and Brady were arrested and publicly charged, the defendant's frequent back and forth between the United States and Colombia stopped. Instead, the defendant stayed in Colombia. (*See* Narcotics Case Dkt. 50 at 1).

On April 28, 2021, the defendant was taken into custody in Colombia on the charges in the Narcotics Case. (Narcotics Case PSR ¶ 21). When the defendant was approached by the authorities, he held himself out as a member of law enforcement, stating falsely that he was with the FBI. (Narcotics Case PSR ¶ 21). He went so far as to present the authorities with fraudulent FBI credentials and associated paraphernalia. (Narcotics Case PSR ¶ 21). At the time of his arrest, the defendant also had in his possession a fraudulent identity document that suggested, falsely, that he had been a member of the armed services. (Narcotics Case PSR ¶ 21). To go along with those fake law enforcement and military credentials, the defendant, who had a previous felony drug conviction, described below, also had in his possession a gun that fires rubber bullets. (Narcotics Case PSR ¶ 21).

As noted above, the defendant pled guilty in the Narcotics Case and was sentenced to 20 months' imprisonment. (PSR ¶ 36).

Prior to the Narcotics Case, in 2002, the defendant was charged with possessing ecstasy, Xanax, marijuana, and a forged NYPD parking permit. (PSR ¶ 35). He was convicted of criminal possession of a controlled substance and was sentenced to five years' probation. (PSR ¶ 35).

Honorable Analisa Torres
United States District Judge
November 3, 2024
Page 8

### III. Procedural History

On January 19, 2024, the Honorable Katharine H. Parker, United States Magistrate Judge for the Southern District of New York, authorized a criminal complaint charging the defendant with one count of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2), in connection with his lies to the Probation Office and the Court about his purported drug addiction. (Dkt. 1). The defendant was arrested on January 22, 2024, and was released on bail that same day.[4] (Dkt. 4).

On March 21, 2024, a grand jury sitting in this District returned Indictment 24 Cr. 170 (AT), which charged the defendant with the same count as the complaint. (PSR ¶¶ 1-2).

On June 20, 2024, the defendant appeared before the Honorable James L. Cott, United States Magistrate Judge for the Southern District of New York, and pled guilty to the sole count in the Indictment pursuant to a plea agreement. (PSR ¶ 4). On June 27, 2024, this Court accepted the defendant's guilty plea. (Dkt. 21).

Consistent with the terms of the plea agreement, the Probation Office has calculated the defendant's applicable Guidelines range to be 18 to 24 months' imprisonment and a fine range of $7,500 to $75,000. (PSR ¶¶ 4.C.1, 76, 84).

The defendant seeks a sentence of "time served." (Dkt. 26 at 1). The Probation Office recommends a sentence of 366 days' imprisonment and a $7,500 fine. (PSR at 26).

### IV. The Court Should Impose a Sentence of At Least 366 Days' Imprisonment

#### A. Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid

---

[4] The PSR incorrectly states that the defendant was arrested on January 20, 2024. (PSR ¶ 17).

unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant;
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. Discussion

The Section 3553(a) factors weigh in favor of imposing a sentence of at least 366 days' imprisonment, which is below the applicable Guidelines range of 18 to 24 months' imprisonment.

*First*, a sentence of at least 366 days' imprisonment is necessary to reflect the nature and circumstances of the offense and the seriousness of the offense. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). The defendant's conduct was brazen and egregious. He repeatedly lied to the Probation Office and the Court in a premeditated and deliberate effort to mislead the Court and induce it to provide unwarranted leniency at sentencing. *See Chibuko v. United States*, No. 16 Civ. 2098 (VLB), 2020 WL 1140888, at *8 (D. Conn. Mar. 9, 2020) ("Mr. Chibuko lied to the Probation Office when he was interviewed pre-sentencing . . . in an apparent attempt to have his sentence reduced or eliminated. That is classic obstruction of justice."). This conduct undermined the sentencing process in the Narcotics Case and put the Court in a position of making an important, fact-intensive decision based on a false premise—a transparent attempt to perpetrate a miscarriage of justice. (*See* PSR at 26 ("An aggravating factor in this case is Hernandez's deceit to the Probation Office, the Court and briefly to the drug treatment program.")). As the Probation Office explained, "[t]he defendant's false statements are part of a court record and the presentence report and undermine the integrity of the process. Hernandez attempted to manipulate the court system for his own personal benefit." (PSR at 26). And the Court ultimately imposed a sentence well below the defendant's Guidelines range, after noting that it had considered the defendant's purported addiction. (*See* Narcotics Case Dkt. 108 at 7). This serious conduct deserves a meaningful sentence.

*Second*, a sentence of at least 366 days' imprisonment is necessary to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). The defendant harmed the criminal justice process and victimized the Court and the Probation Office by the commission of this offense. And as the Probation Office explained, "[a]n additional aggravating factor in this case is Hernandez participated in a drug treatment program and utilized the resources of that program,

services that could have been used by someone who had a substance use problem. By feigning a substance addiction, the defendant wasted the time and efforts of the drug treatment program, misused its services, and undermined their efforts to treat addiction." (PSR at 26-27). Importantly, the Probation Office has limited resources, as do substance abuse counseling services. They should be focused on helping those who are truly in need. Here, however, "[t]he defendant wasted the time of the legitimate clients in the program and compromised the purpose of group support, which is to offer understanding, coping strategies, and strength in shared experiences." (PSR at 27). He received these services only because he lied his way in, with the specific intent to avoid just punishment for his narcotics trafficking conduct. This direct, negative consequence of the defendant's obstruction justifies a substantial sentence.

*Third*, a sentence of at least 366 days' imprisonment is necessary to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. *See* 18 U.S.C. §§ 3553(a)(2)(B), (a)(2)(C). As the Probation Office has correctly recognized, "[g]eneral and specific deterrence are paramount in this case." (PSR at 27). It is important that the sentence imposed upon the defendant send a message to future participants in the criminal justice system that lying in order to mislead the Court to achieve their own personal goals will have serious consequences. It is also important that this particular defendant—who committed the instant crime while awaiting sentencing after pleading guilty to committing another federal crime—be specifically deterred from additional criminal conduct. As described above, this is the defendant's third criminal case, and the requested sentence is needed to ensure that he is deterred from continuing his pattern of criminal conduct.

*Fourth*, a sentence of at least 366 days' imprisonment would be consistent with sentences imposed in similar cases and would avoid unwarranted sentence disparities. *See* 18 U.S.C. § 3553(a)(6). Courts in this Circuit have imposed meaningful sentences of incarceration where defendants have engaged in making false statements to the Probation Office. *E.g.*, *United States v. Simmonds*, 425 F. App'x 31, 2011 WL 2437630, at *2 (2d Cir. June 20, 2011) (affirming defendant's 30-month sentence for making false statements to the Probation Office); *United States v. Whitaker*, 745 F. App'x 438, 439-40 (2d Cir. 2018) (affirming defendant's 24-month sentence for violating supervised release by making false statements to the Probation Office and failing to register his email account with the sex offender registry); *United States v. Loudon*, 385 F.3d 795, 798 (2d Cir. 2004) (affirming defendant's 63-month sentence for making false statements to the Probation Office, contempt, and wire fraud). Courts have also imposed significant sentences of incarceration where defendants have engaged in obstruction of judicial proceedings. *E.g.*, *United States v. Simon*, No. 12 Cr. 720 (PAE), Dkt. 18 (S.D.N.Y. Apr. 18, 2013) (defendant sentenced to 12 months' imprisonment after pleading guilty to obstruction of justice for submitting a falsified college transcript in connection with a supervised release violation sentencing); *United States v. Reich*, No. 04 Cr. 587 (NGG), Dkt. 105 (E.D.N.Y. May 1, 2006) (defendant sentenced to 27 months' imprisonment after pleading guilty to obstructing a judicial proceeding, forging a judge's signature, and making a false statement to a federal officer in connection with his fabrication of a court order in a civil lawsuit). While the facts and circumstance of this case, and the defendant's individual history, are of paramount import and amply justify a sentence of at least 366 days' imprisonment, the sentences imposed in these other cases are useful datapoints that the

Court should consider in determining that such a sentence is appropriate and necessary to avoid unwarranted sentencing disparities.

*Fifth*, the Court should reject the defendant's request for a sentence of time served, which would effectively be zero days of imprisonment. Such a sentence would be a drastic variance from the Guidelines range, and far lower than what the Probation Office recommends. The defendant does not deserve such a shockingly low sentence. The Government acknowledges the presence of some mitigating factors, including certain aspects of the defendant's upbringing (Def. Ltr. 4), the defendant's work history (Def. Ltr. 4-5), his apparent compliance with the terms of his supervised release in the Narcotics Case and his pretrial release in this case (PSR ¶ 5; Def. Ltr. 5), and the fact that he ultimately confessed that he had lied to the Court and the Probation Office (Def. Ltr. 5-6). But, as the Probation Office has explained, "[w]hile a variance is appropriate, the sentence must be fashioned to afford adequate deterrence to criminal conduct in the future, both by Hernandez, and any other individuals who consider lying to the Court to influence an official proceeding." (PSR at 27). Accordingly, the Government agrees with the Probation Office that, although a modest downward variance is justified in light of the mitigating factors referenced above, "a custodial sentence in this case is warranted because Hernandez breached legal and ethical rules and showed a disregard for the Court." (PSR at 27). Relatedly, a non-custodial sentence in this case would be particularly inappropriate given that a direct consequence of the defendant's crime was the receipt of a shorter term of imprisonment in the Narcotics Case than he likely would have received had he not misled the Court.

### V. The Court Should Impose a Fine of $7,500

The Court should also impose a fine at the bottom of the Guidelines range of $7,500 to $75,000. Section 5E1.2(a) "requires a district court to 'impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.'" *United States v. Glick*, 142 F.3d 520, 528 (2d Cir. 1998) (citation omitted). In assessing an appropriate fine, the sentencing court must consider certain factors, such as the defendant's income, earning capacity, and financial resources. *Id.* These factors are relevant "only to the amount of the fine, rather than the decision whether to impose a fine." *United States v. Corace*, 146 F.3d 51, 56 (2d Cir. 1998). Here, a fine at the bottom of the Guidelines range is reasonable and appropriate. As the Probation Office has found, the defendant "has not shown that he is unable to pay a fine" (PSR at 27), and therefore he has not satisfied his "burden to show indigence," whether now or in the future. *Corace*, 146 F.3d at 56. Additionally, the Government anticipates that the defendant will have no forfeiture or restitution obligations as a result of the instant conviction. For these reasons, the Government requests that, consistent with the Probation Office's recommendation, the Court impose a fine of $7,500. (PSR at 27 ("A $7,500 fine is recommended based on the defendant's financial condition.")).

Honorable Analisa Torres
United States District Judge
November 3, 2024
Page 12

### VI. Conclusion

For the reasons set forth above, the Court should impose a sentence of 366 days' imprisonment and a fine of $7,500.[5]

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   /s/ Robert B. Sobelman
Samuel P. Rothschild
Robert B. Sobelman
Assistant United States Attorneys
(212) 637-2504/2616

cc:  Samuel Gregory, Esq. (by ECF)

---

[5] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).